Whitaker, Judge,
delivered the opinion of the court:
In his petition plaintiff claims that, when he was released from active service on January 17, 1956, he was unfit for military duty and should have been discharged for physical disability. He sues for the retired pay he would have been entitled to had he been so discharged.
Plaintiff had a long Army career. He served for a few months in World War I; then, from 1920 to 1926, he served in the North Dakota National Guard. In the meantime, on June 1, 1922, he had been appointed a second lieutenant in the Army Eeserve Corps. On August 18, 1940 he was called to active duty and served until March 1,1948. He was again *133 called to active duty on November 15,1948, and served until January 17, 1956.
April 30,1955 was plaintiff’s 55th. birthday. He was then a lieutenant colonel. Under Army regulations, ordinarily, when a lieutenant colonel in the Keserve Corps arrived at age 55 he could no longer continue in that grade, but, since plaintiff was then in the hospital, he was continued on active duty until January 17,1956, when it was expected his physical examination would have been completed.
Plaintiff entered the hospital “* * * for evaluation of his cardiac status * * He was found to have auricular fibrillation, which seems to be a rapid twitching of the muscular walls of the auricle of the heart. He also complained of arthritis in his hip and toe, and of deafness. Plaintiff was given various examinations over a period of three months, both of his heart and for his arthritis.
On May 28,1955, the Rheumatology report stated, in part:
Pt. seen again and hip injected with 1% cc hydro-cortone. Re-evaluation of his condition was made. It is thought that this patient is able to perform military duty consistent with his age and grade.
On June 21, 1955, the Cardiology report stated, in part:
Recommendation: It is felt that from a cardiovascular standpoint, this individual can be considered physically fit for full military duty.
On July 25, 1955, when plaintiff was given leave from the hospital, the doctors’ progress notes recited, in part:
25 Jul * * *
Pt. has been fully evaluated <fi also observed almost 3 months to note any change or progression in his symptoms.
No disabling or disqualifying defects noted. Considered qualified for general military service — can perform duty commensurate with his age and grade. 3 Dec 55 Patient returned to duty today. States he still has some trouble with his right hip.
*****
Ht — sounds good — no abnormal rhythm. No murmurs * * *
*134 On the same day (July 25, 1955) a narrative summary of plaintiff’s hospitalization was filed, giving the “history of the present illness,” the “past history,” the “physical examination,” the “laboratory and x-ray studies,” the “consultations,” the “course in hospital,” and the “Diagnoses”. The diagnosis of the heart trouble was “cured”, and the arthritis of the hip and left great toe and deafness were all said to be “moderate”.
Plaintiff was recalled to the hospital in the first part of January 1956 for final examination prior to separation. The diagnosis arrived at as a result of the final examination on January 12,1956, was the same as the previous one.
Plaintiff was released from active duty not by reason of physical disability. He was not sent before a physical evaluation board, and it is not alleged that he requested to be.
On the day after his discharge, he was rated 50 percent disabled by the Veterans’ Administration, as a result of which he has been drawing disability compensation since October 8, 1957, of $111.50 per month, but in a somewhat smaller amount prior thereto.
Although at the time of his discharge plaintiff did not request a hearing before the Physical Evaluation Board, on October 15, 1956, ten months later, he requested the Army Board for Correction of Military Becords to correct his records to show he had been discharged for physical disability. This request was denied. He renewed it about two years later, and this request was also denied.
In the trial of the case in this court before Trial Commissioner Day, plaintiff introduced a highly qualified internist by the name of William Travis Gibb, who testified that plaintiff was suffering from auricular fibrillation and advanced arteriosclerosis, osteoarthritis, and a tendency toward asthma. Dr. Gibb, who had naval service during World War II, testified that in his opinion plaintiff was not fit for full military duty, but perhaps was fit for limited duty.
Defendant introduced two doctors of high professional qualifications, Drs. Hall and Metz. Dr. Hall testified that plaintiff’s heart condition did not render him unfit for military duty, and Dr. Metz testified that his arthritis did not render him unfit. Neither side offered testimony with respect to his deafness.
*135 After three months of extended and apparently thorough examination, the Walter Need Hospital authorities thought plaintiff fit for military duty. Plaintiff himself thought so, because prior to his release he had requested retention on active duty for two years. Plaintiff made no protest when he was released not for physical disability. The Correction Board on two occasions, two years apart, found that no injustice had been done plaintiff in not releasing him for physical disability, and on the trial of this case in this court two doctors, who had not been connected with the case previously, examined the records and testified they did not show that plaintiff was unfit for duty.
On the other hand, we have the testimony of Dr. Gibb, who thought plaintiff was perhaps fit for limited duty, but not for full duty, and the fact that the Veterans’ Administration had rated plaintiff 50 percent disabled. We are not persuaded that these two things counter-balance the testimony offered by defendant, which we have detailed above. With respect to the Veterans Administration’s rating, see Holliday v. United States, 128 Ct. Cl. 647. It is for the Army to determine who is unfit for military duty. If it acts fairly, competently, and conscientiously, plaintiff is without redress in this court. There is insufficient evidence that it failed to do so. Indeed, there is no allegation that it acted arbitrarily or capriciously.
Even at 55 years of age many men feel some twinges of arthritis, the walls of their arteries lose some of their resilience, their hearing becomes somewhat less acute. It would not be easy for them to walk 50 miles in 20 hours, perhaps impossible, but, still, they are not ready to be “turned out to pasture.” Their minds are still keen, their knowledge and experience invaluable. They may even have acquired a little wisdom. They are not expected to do the arduous physical chores of the young, but they have the capacity to plan and to direct, upon the efficiency of which the success of the Army depends.
In the winter of 1941, Winston Churchill, the Prime Minister of Great Britain, and one of the truly great men of all time, wrote a letter to his Secretary of War, with reference to an order of a Division Commander of the British Army, re *136 quiring all members of tbe Division “from generals to privates” to run seven miles cross-country, in which he said:
A colonel or a general ought not to exhaust himself in trying to compete with young boys running across the country seven miles at a time. The duty of officers is no doubt to keep themselves fit, but still more to think for their men and to make decisions affecting their safety or comfort.
Who is the general of this division, and does he run the seven miles himself ? If so, he may be more useful for football than war. Could Napoleon have run seven miles across country at Austerlitz ?
Plaintiff is now receiving some $525 monthly in retirement pay and veterans’ benefits. We do not think he is entitled to more on the ground that he was physically disabled at the time of his discharge.
Plaintiff[1]’s petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff enlisted in the Army of the United States on October 30,1918, and served on active duty therein until December 14, 1918. He enlisted in the North Dakota National Guard on December 6, 1920, and served until March 28, 1926. He was appointed second lieutenant, Officers Deserve Corps, on June 1,1922. He was called to active duty as a Deserve officer on August 18, 1940, and served as such until March 1, 1948, when he was relieved from active duty, not by reason of physical disability. He was recalled to active duty November 15,1948, and served until January 17, 1956, when he was relieved from active duty not by reason of physical disability. On that date he held rank as lieutenant colonel, Armor, United States Army Deserve. The plaintiff’s date of birth was June 20,1900.
2. The plaintiff by this action seeks to recover retired pay at the rate of 75 percent of the basic pay of an officer of his grade and length of service because he says “* * * that on January 12,1956, he was unfit for military service by reason of atrial paroxysmal fibrillation, arthritis of right hip joint, *137 arthritis of inter-phalangeal joint of his left great toe, and deafness, all incurred in line of duty and incident to his extended active service. * * *” No allegation is made that any action by anyone in effecting his release from active duty was arbitrary or capricious.
3. Plaintiff was transferred to the Ketired Eeserve on June 19, 1956, and placed on the Honorary Eetired List on February 10, 1958. On June 20,1960, plaintiff, on his 60th birthday, was granted retirement pay pursuant to Title III, Army and Air Force Vitalization and Eetirement Equalization Act of 1948, 62 Stat. 1081, 1087. Plaintiff has never received retirement pay for physical disability.
4. Plaintiff was relieved from active duty because he had attained the maximum age in the grade of lieutenant colonel as established by the Eeserve Officer Personnel Act of 1954, 68 Stat. 1147, and the implementing regulations. Section 326 of the Eeserve Officer Personnel Act, supra, which was enacted on September 3, 1954, provided that the maximum age for active status in the Eeserve would be established as 55. Immediately thereafter certain aspects of this legislation were implemented by D.A. Message 552357 (September 29, 1954) which established a maximum age of 55 at which mandatory release would be required for non-regular officers in the grade of lieutenant colonel and below. Those lieutenant colonels who were not qualified for retirement under Title II of the Army and Air Force Vitalization and Eetirement Equalization Act, 62 Stat. 1084, by age 55, would be separated commencing April 30, 1955. Plaintiff was in this category and thus was originally scheduled for separation on April 30, 1955. On that date he was undergoing hospitalization and it was necessary to retain him on active duty beyond his previously scheduled release date so that he could be given full treatment consistent with his illness. Upon his release from the hospital on January 16, 1956, he was separated from active duty in accordance with the age and grade policy referred to above.
5. When plaintiff entered upon extended active duty with the Army in 1940, he was in good health. Subsequent to plaintiff’s entry upon extended active duty, he was hospitalized with malarial fever, tertian. He also suffered an infec *138 tion of bis left toe, necessitating surgery and extended hospitalization. Neither of these conditions rendered him unfit for military duty, and he was returned to duty.
6. On November 12, 1947, while plaintiff was serving in Mannheim, Germany, he was admitted to the 130th Station Hospital with a chief complaint of “[d]izzy spells — Nov. 10-11.” The admitting diagnosis was “[cjardiac irregularity cu [cause undetermined].” Plaintiff remained in the hospital until November 22, 1947, when he was released to “duty, general service.” The report of the physical examination made during the hospitalization stated in pertinent part:
Heart: Not enlg. No murmurs. No pulse deficit. Occ. extra systoles. * * *
*****
Bones and joints: SI. crepitance in right hip.
The progress note of November 21, made the day before plaintiff’s release, stated “[n]o cardiac path demonstrated. BMP [basic metabolic rate] + 27, + 45. * * *” The final summary compiled at the termination of plaintiff’s hospitalization stated:
This 47 yr. old man entered with hist fatigue, palpitation, syncope — 48 hrs before adm. MC [Medical Clinic] noted pulse deficit & irregularity heart beat on referral slip. PE [physical examination] neg except for occ extra systole [a premature contraction of an auricle or ventricle or both while the fundamental rhythm is maintained at the sinus][1] [undecipherable word] & brownish pigmentation hands & arms. Routine lab neg. EKG[2] neg. BMR + 27 and + 45. No. hist suggesting hyperthyroidism and no physical findings. Pulse regular and patient rested well during stay. Incidental history of pain in right hip rad to knee. . X-Ray showed flattening and irregularity of head right femur and arthritic changes in acetabulum. Final diagnosis
fl) No C.V. [cardiovascular] Dis found.
(2) Arthritis, traumatic, right hip, chronic, mod. sev., secondary to old slipped epiphysis of head of right femur, cu [cause undetermined].
*139 7. On February 27, 1948, prior to Ms release from active duty, on March 1,1948, plaintiff was examined at the separation branch, Camp Kilmer, New Jersey, and found not incapacitated for general service, and eligible for separation. In connection with this examination plaintiff was given an electrocardiogram which was negative. His pulse when tested was full and regular. Under medical Mstory, the examination report stated inter alia:
e. Shell blast April 1943 (ringing in ears) 11th Evacuation Hosp, Italy, 1 day. * * *
f. Fainting spell, 130th SH, Ger., Dec 11947,11 days. Electrocardiograph and X-Rays negative. Nervous condition. * * *
Under the caption physical examination of bones, joints and muscles, it was noted:
He had a shell fragment into the big toe, left, which became infected and then gangrenous. After a long period of treatment healing took place, but the toe is stiff at the interphalangeal joint. IMS. Physical examination, fusion of the interphalangeal joint of the big toe, left. IMS.
Bight Hip: Had pains in left [right ?] Mp in Sept. 1947. X-Rays showed an arthritic condition. Still has pains in the Mp which are somewhat relieved by heat. * * *
8. On September 28,1948, the plaintiff was given a physical examination in connection with his request for extended active duty. As a part of that examination he was, on the next day, given an electrocardiogram which was interpreted thus by the medical officer “normal EKG.”
The board of three medical officers found that the plaintiff was not incapacitated for general service.
After consultation reports had been made by the chief, medical service, and the chief, orthopedic service, the report of examination was on October 28, 1948, endorsed “Qualified for General Military Service” by the Medical Section, Headquarters, Second Army. It was similarly endorsed on December 10, 1948, by the Medical Section, First Army.
*140 9. The consultation reports referred to in the preceding finding are quoted as follows:
CONSULTATION
18 October, 1948
Ee: Patton [sic], Franklin W.
Major, 0168150

HISTORY:

In October, 1943, this man, while in Oran area, developed fever and severe headache. Fever lasted 3 days, then subsided. About one week later, the fever recurred and lasted one day. He had repeated malaria smears, and finally a positive smear was obtained. He had two courses of quinine and was discharged with the diagnosis of “Malaria fever, tertian, p. vivas, recurrent”. Hospitalization was at 151st. station hospital, Oran, Algeria.
In 1944, he again had headache and fever, and was treated with quinine with presumptive, diagnosis of malaria. No smears were taken. In mid-1944, he again had chills and fever with headache, and again received quinine, no smears taken. In 1945, at Camp Clowder, [sic] Mo., he again had headache and fever and was treated with quinine. Again, the etiology was not proved. However, good response to quinine therapy occurred on each of the above illnesses.
In December, 1947, he experienced vertigo, but no fever. He had a general physical examination, and malaria smears were negative according to the patient.
He has had no chills or fever other than noted above. No hematuria. Feels well.

physical examination:

General: Stocky, somewhat obese male, not appearing ill. Color, good. Membranes normal color.
Eyes: No scleral jaundice.
Abdomen: Spleen not palpable, liver felt only on inspiration, edge soft.

OPINION:

I do not feel that the malaria infestation noted in the history is incapacitating at this time, nor is it likely to become so in the future. None of the so-called “re *141 currences” noted by the patient were proven by smear, and the diagnosis was on a presumptive basis.
[s] M.H. Powell
M. H. Powell
Captain, Medical Corps
Chief, Medical Service
CONSULTATION
18 October 1948
He: Patton [sic], Franklin W.
Major, 0168150

HISTORY:

In December, 1943, this patient reported to a hospital in Italy with painful feet and infection in great toe of left foot. He was transferred to several different hospitals, among which was the 8th. Evacuation Hospital, and abscess on the left foot was opened at that time. The patient developed high temperature, and had a rather severe post operative course. The foot was drained, and the patient was eventually transferred back to the Third General Hospital, at Mateur, North Africa. At this hospital, the left great toe was again opened, and chronic infected bone was resected. Wound was closed, and the patient’s post operative course was uneventful, resulting in complete wound healing, and no drainage. He was discharged from the hospital in May, 1944, and sent back to full duty in Italy.
The only sequalae which the patient suffered from his feet was a slight degree of swelling and some pain and burning in both feet with any change in the weather. The patient served up until March 1, 1948 on full military duty, and got along perfectly okeh except for the slight burning and pain, and slight swelling with each change in the weather.

PHYSICAL EXAMINATION:

Examination reveals well healed incisions along the left great toe, partial nail on both great toes. No other abnormalities of the feet. At the time of examination, there is no swelling. There is excellent dorsalis pedis pulse bilaterally, good posterior tibialis pulse, bilaterally, and good popliteal pulses bilaterally.
X-Ray examination reveals: No bone or joint pathology.

IMPRESSION:

In 1944, on discharge from Third General Hospital in Mateur, North Africe, [sic] this officer was sent back *142 to full military duty. He did full duty from that time up until 1948 without losing any time because of his feet. Consequently, we feel that he is physically able to return to active duty as a military officer.
[s] Z. O. Sherwood
Z. O. Sherwood
Captain, Medical Corps
_ Chief, Orthopedic Service
10. Apparently the plaintiff was examined on May 18, 1950, at the Fort Jay, New York, hospital where he spent two days incident to intermittent pain in right hip. An X-ray report reads as follows:
right tttp : There are peripheral changes involving the bone components of the right hip with hypertrophic lip-ping and spur formation involving the head of the right femur and the articular margin of the right acetabulum. The right hip joint is slightly obliterated apparently due to cartilaginous degeneration as well as partial bone reaction. The femoral head appears slightly distorted due to slight flattening and also shows an area of cystic degeneration as well. The etiology of the above finding is not determined.
11. There is in evidence an X-ray report concerning the plaintiff dated April 20,1954, apparently made at some Army hospital, which states:
1. Osteoarthritic moderately severe rt. hip joint.
2. Hand negative.
12. In March 1955, the plaintiff was examined in the outpatient department, U.S. Army Hospital, Salzburg, Austria. On March 9,1955, an X-ray report was made which showed:

Chest:

No change since 6 Dec. 54. The heart is not enlarged, although the left ventricle shows mild prominence. CT index is 0.44. There is early aortic dilatation, without visible aortic calcification. The lungs are clear.
Certain notes were made in his medical records on the plaintiff’s condition at the above installation, which read as follows, omitting doctors’ names:
11 Mar 1955 Fibrillation has subsided. To continue on quinidine 0.2 grams T.A.D. [twice a day].
*143 17 Mar 1955 Feels better — P=72, full & regular — will get repeat E.K.G.
24 Mar 1955 Peg. Sinus Rhythm lias now reestablished itself. No cardiac consciousness at present but there was a feeling of weight on chest & constriction several days ago. I believe he may have had paroxysmal auricular fibrillation although we must consider the possibility of an organic coronary basis for his complaint in this age group. He has a history of anginaneurotic edema. B.P. 150/100. _
_ [Medicinal prescription omitted.]
31 Mar 1955 [There is a note which is unclear, but which concludes as follows]:
—Continue Serpasil
—Sinus rhythm is established without further need of quinidine.
Patient must take things slower. Must quiet down
13. In April 1955, the plaintiff was returned to the United States. Upon his arrival he presented himself at the United States Army Hospital at Camp Kilmer, New Jersey, where he was admitted on April 26,1955, “* * * for evaluation of his cardiac status. * * *” An electrocardiogram was made the next day which was summarized by the reporting physician as follows:
Auricular fibrillation. No other evidence of myocardial damage.
The same physician on a progress note the following day stated:
Agree — etiology obscure — probably coronary arterio-sclerotic heart disease — chronic not acutely ill.
On May 1, 1955, the plaintiff was transferred to Walter Eeed Army Hospital in Washington, D.C., with the following diagnosis:
Auricular fibrillation, cause undetermined. Probably coronary arteriosclerotic heart disease.
Deafness [illegible word] bilateral, probably due to acoustic trauma.
14. Plaintiff arrived at Walter Eeed Army Hospital on May 3, 1955, and remained hospitalized until August 26, 1955. From August 26, 1955, until January 17,1956, plain *144 tiff was not hospitalized, though technically he was still assigned to Walter Need Army Hospital. During that period he was on leave, subsisting elsewhere and/or on duty with a detachment at Walter Need. On January 16,1956, he was relieved from active duty because his category had expired. The final diagnosis upon plaintiff’s release from Walter Need Army Hospital on January 16,1956, was as follows:
1. * * * Atrial paroxysmal fibrillation unassociated with underlying organic heart disease; cured. * * *
2. * * * Arthritis of right hip joint due to trauma, moderate, a.i. in fall from vehicle in Africa in 1943; unchanged. LOD:Yes.
3. * * * Arthritis of the interphalangeal joint of the left great toe due to infection, organism unknown, incurred in 1943, moderate; unchanged..
4. * * * Deafness, perceptive, bilateral, moderate, cause undetermined. LOD: Yes.
15. The admission note made at Walter Seed Army Hospital on May 3, 1955, the date of plaintiff’s admission, states in pertinent part as follows:
Past history * * * The patient was studied in 1948 in Heidelberg, Germany, because of an episode of syncope which occurred while at work. He was observed for heart disease at the hospital. His check-up included electrocardiograms and physical examination. No definite diagnosis of heart disease was made and as he recalls the final decision was that his symptoms were due to nervous tension. All electrocardiograms on annual physical examinations have been normal and there is no history of heart murmurs. * * *
Physical examination * * * 'Cardiac examination reveals a grossly irregular rhythm. PMI is not felt. There is no cardiac enlargement to percussion. P2 is louder than A2. The heart sounds are of good quality. No murmurs are heard. * * * There is a deformity of the great toe on the left foot secondary to an osteomye-litis incurred in the war. Motion of the right hip is within normal limits. * * *
Impression: The patient is exhibiting auricular fibrillation. There is no evidence of rheumatic valvular disease or of thyrotoxicosis as a cause for this. There is no history suggestive of the injection of toxic substances or of excess smoking. This may represent an idiopathic auricular fibrillation occurring in a normal heart, or may *145 represent auricular fibrillation secondary to arterioscle-rotic heart disease.
16. The doctors’ progress notes which were prepared while plaintiff was hospitalized at Walter Need showed that by June 11,1955, he was off both digitalis and quinidine, and continued to have normal sinus rhythm with no complaints. The doctors’ progress notes for July 25,1955, and December 31,1955, state in part:
25 Jul * * *
Pt has been fully evaluated & also observed almost 3 months to note any change or progression in his symptoms.
No disabling or disqualifying defects noted. Considered qualified for general military service — can perform duty commensurate with his age and grade.
3 Dec 55 Patient returned to duty today. States he still has some trouble with his right hip.
‡ ‡ $
Ht — sounds good — no abnormal rhythm. No murmurs. * * *
17. A Cardiology consultation report prepared on June 21, 1955, while plaintiff was hospitalized at Walter Reed, states in part as follows:
Diagnosis: * * * paroxysmal atrial fibrillation due to unknown cause. Functional capacity IA.
Recommendation: It is felt that from a cardiovascular standpoint, this individual can be considered physically fit for full military duty.
Comments: * * * The episode which began in late February 1955 with symptoms of extreme fatigue, weakness, lightheadedness and dyspnea on exertion? followed an unusually prolonged period of physical activity. At no time during this physical stress or immediately preceding his acute symptoms did he complain of any chest pain or pressure, epigastric pain, back or shoulder pain. Subsequently during his continued hospitalization and while he continued to fibrillate despite abortive attempts to convert his arrythmia, he did not develop any symptoms suggestive of angina or coronary artery insufficiency. With rest he improved symptomatically and since the fairly easy conversion of his arrythmia here on the 17th of May 1955, he has continued to improve until he states that at present he feels quite well. Care *146 ful questioning fails to establish, any history suggestive of rheumatic fever or rheumatic _ equivalence in the past nor is there any history suggestive of some underlying metabolic disorder. He disclaims the use of any medication prior to his episode in February. There is no history that he has ever been found to be hypertensive.
Physical examination * * * Examination of the heart reveals no clinical evidence of enlargement; no shocks or thrills are felt. Heart sounds are of normal quality. The rhythm is regular. The second sounds are of normal quality. No murmurs are heard.
Laboratory studies reveal a normal electrocardiogram at the present time. The chest x-ray reveals no abnormality in cardiac size or configuration. *_ * *
I feel that there is no evidence on which to base a diagnosis of organic heart disease in this individual at the present time and consider that the episodes of atrial fibrillation are probably associated with physical and emotional stress. While this officer may have some de-free of underlying arteriosclerotic heart disease, he has ad no symptoms even remotely suggestive of coronary insufficiency and there is likewise no other objective evidence upon which to base this diagnosis.
18. While plaintiff was at Walter Eeed, X-ray films of his chest made at another hospital in March and April of 1954 were examined by a radiologist at Walter Eeed. In his report of this examination the radiologist stated in pertinent part:
chest: * * * The heart is normal in size, shape and position. * * *
On May 4,1955, an X-ray was made of plaintiff’s chest in the Eadiology Clinic at Walter Eeed, and the radiologist in his report stated in part as follows:
* * * The CT ratio is 13*4/29%. There is minimal enlargement of the left ventricular segment. * * *
19. On May 25, 1955, plaintiff was examined in the Physical Medicine Clinic and in the Eheumatology Clinic at Walter Eeed. He was re-examined in the Eheumatology Clinic on May 28, 1955. On May 31, July 6, and July 18, 1955, he was examined in the Orthopedic Clinic. In the history given by plaintiff to the doctors in those clinics, he stated that he had fallen from a truck in 1943, injuring his *147 right hip. He further stated that he was treated at a local medical installation, after the fall and the hip was manipulated, but he was not hospitalized. He also stated that he did fairly well until 1947 when he was hospitalized because of pain in his right hip. He stated that he had reinjured his hip in 1947, and informed them that he had had intermittent discomfort for the past 7 years. Plaintiff’s Army medical record reveals that he had occasionally complained of pain in his right hip, since 1947, but this was the first time that he had ever told a doctor that he had injured his right hip in 1943 or 1947. Plaintiff’s Army medical records for the years 1943 and 1947 do not reflect that he hurt his hip nor that he was treated in an Army hospital for any injuries to his hip. His Army medical records for 1947 do show that he was admitted to a hospital in Germany in November of 1947, complaining of dizzy spells, and that while hospitalized he incidentally complained of pain in his right hip. That was the first time that plaintiff had ever complained of pain in his hip.
20. The doctors in the Physical Medicine, Rheumatology and Orthopedic Clinics, at Walter Reed, who examined plaintiff were all of the opinion that he had arthritis of his right hip joint. The Rheumatology consultation report of May 28,1955, stated in pertinent part:
Pt. seen again and hip injected with iy2 cc hydrocor-tone. Re-evaluation of his condition was made. It is thought that this patient is able to perform military duty consistent with his age and grade.
The Orthopedic consultation report of July 6, 1955, stated in part:
Physical examination reveals that patient has crepi-tation on motion in the right hip joint. He has pain at 90° flexion and at 45° abduction, internal and external rotations are limited. Review of x-rays show severe degenerative arthritic changes involving the right hip joint.
Impression: Traumatic arthritis, right hip joint, probably due to partial dislocation sustained in 1943 while patient was on duty in North Africa.
*148 21. A narrative summary concerning the plaintiff’s hospitalization at Walter Need Army Hospital, showing hospitalization of 83 days from May 3, 1955, to July 25, 1955, reads as follows:
History of Present Illness: This 54-year-old white Lt. Col. was transferred here from the USAH, Camp Kilmer, N.J. The patient dated the onset of his present illness to late February 1955 at which time after returning from a leave he developed a rather abrupt onset of severe fatigue, dizziness and weakness. This persisted for 2 days and he was seen at the USAH in Salz-burg, Austria where he was found to be fibrillating. He was placed on an unknown quantity of quinidine and according to transfer records there Ms fibrillation was eventually converted to normal sinus rhythm. He was never admitted and came back to the United States on normal rotation. He was quite ill on the boat and when he arrived at Camp Kilmer he was again seen at the hospital where recurrence of Ms atrial fibrillation was noted and he was transferred here for further study. At the time of admission the patient had no sensation of palpitation and denied dyspnea, ankle edema or chest pain. He did admit to severe fatigue.
Past History: The patient was hospitalized in 1948 with an episode of syncope. Records of that occasion revealed that the diagnosis was cardiac arrythmia wMch apparently represented multiple premature contractions. The patient incurred a fracture dislocation of the right femur in 1943 while in North Africa and stated he had had some pain and limitation of motion in the right hip joint since then. He also had frost bite with infections and osteomyelitis in the left great toe during WW II in Italy.
Physical Examination: Examination revealed a small, alert, white male who appeared comfortable. Blood pressure was 112/80. Pulse was 82 and irregular. The funduscopic examination was normal. The remainder of the ENT examination revealed no significant abnormalities. Chest was clear. Cardiac examination revealed a grossly irregular rhythm. There was no evident cardiac enlargement. Heart sounds were of good quality and no murmurs were heard. There was no enlargement of the liver or spleen. The pedal pulses were all palpable. Examination of the rectum, genitals and neurological examination were within normal limits.
Laboratory and X-Ray Studies: WBC, 6,950 with *149 normal differential. Hemoglobin, 15.4.. ESE, 6 millimeters per hour. Urine: Specific gravity, 1.028; albumin, sugar and microscopic, negative. Serological test for syphilis was negative. Blood sugar, 95 milligrams percent. Blood lipids, 966 milligrams percent. Blood urea nitrogen was 17 milligrams percent. Total cholesterol was 256 milligrams percent. Twenty-four radioactive iodine uptake was 17%. Serum protein was 6.2 grams percent with normal AG distribution. Chest x-ray No. 85538 revealed a calcified node in the mid-portion of the right lung field and was otherwise normal. X-rays of the hands revealed an old traumatic arthritis involving a distal interphalangeal joint of the left index finger. The remainder of the joints were normal. X-rays of the feet revealed obliterative arthritis of the interphalangeal joint of the left great toe. PA of the pelvis revealed marked narrowing of the joint space of the right hip with considerable hypertrophic new bone formation about the articular margin of the femoral head with sclerosis and eburnation of the roof of the acetabulum and numerous small radiolucent areas in the head of the femur due to fibrocystic change. Impression was severe post-traumatic arthritis of the right hip. The remainder of the pelvis and sacro-iliac joints appeared normal. ECG No. A-7007 on admission revealed atrial fibrillation with a rate of 90 per minute. ECG on 21 July 1955 prior to discharge was completely normal.
Consultations: The patient was sent to the Isotope Clinic where a radioactive iodine uptake was normal and where a scintigram revealed no enlargement of the thyroid gland. A rheumatology consultation was obtained and examination revealed slight limitation of motion and pain in the right hip. In connection with this on 28 May 1955 aspiration of fluid from the right hip was performed and hydrocortone was injected. The patient was seen on three occasions by the Orthopedic Service and the diagnosis was traumatic arthritis of the right hip secondary to dislocation. He was presented to the orthopods with the question as to the possible disability resulting from this and after final examination by the Chief of the Service in the Problem Clinic it was felt that the patient had no disabling orthopedic condition and that no surgical intervention was warranted. He was therefore cleared from [sic] general military service from an orthopedic standpoint. A physical medicine consultation was obtained and the patient was given heat packs to the right hip and exercises to *150 increase the range of motion and overcome muscle resistance. A cardiology consultation was held_ and after careful examination of the records and the patient it was the opinion of the consultant that the patient had atrial paroxysmal fibrillation which was unassociated. with underlying organic heart disease and that the disease was not disabling or disqualifying.
Course in Hospital: The patient was quite comfortable despite fibrillation on admission and was placed on a regular diet and allowed to remain ambulatory. He was digitalized employing digoxin and when full. digi-talization was obtained he was placed on oral quinidine, 0.4 grams, every 2 hours. After a total dose of 1.2 grams the patient became quite nauseated and felt uncomfortable ; however, he converted to normal sinus rhythm on this dosage. Quinidine was maintained for a few days and then discontinued without recurrence of the atrial fibrillation and eventually digitalis was also discontinued. Careful cardiac examination following the reversion to normal sinus rhythm revealed no murmurs and no evidence of rheumatic heart disease. The electrocardiograms initially showed digitalis and quinidine effect but with the discontinuance of these drugs the electrocardiogram became normal. The patient was allowed a rather prolonged period of hospitalization to be sure that no cardiac problem would recur and to note his exercise tolerance at normal sinus rhythm. The latter increased rather well and the patient’s only complaint was some fatigue. At the present time the patient has received the maximal benefit of hospitalization and there is no evidence of significant organic heart disease or of significant orthopedic disease which would warrant his appearance before a Medical Board. He is therefore to be discharged to general duty.

Diagnoses:

425 (1) Atrial paroxysmal fibrillation unassociated with underlying organic heart disease ; cured. LOD: Yes.
247-400.0 (2) Arthritis of right hip joint due to trauma, moderate, a.i. in fall from vehicle in Africa in 1943; unchanged. LOD: Yes.
24x6-100 (3) Arthritis of interphalangeal joint of left great toe due to infection, organism unknown, incurred in 1943, moderate; unchanged. LOD: Yes.
x70-yxx- (4) Dearness, perceptive, bilateral, moderate, 1-0 cause undetermined. LOD: Yes.

*151
Operation:

247-023 Aspiration of right hip joint with injection of hydrocortone on 28 May 1955.

Diagnostic Procedures:

ECG No. A-7007, 7 from 6 May through 21 July 1955.
22. From about July 25, 1955, to early January 1956, the plaintiff was on sick leave or other leave from Walter Need Army Hospital. Although he testified that he met a disposition board of three officers, no record of the results of such board is in evidence, nor was there any testimony by anyone as to the nature, extent or quality of any evidence given before such board.
23. On January 12, 1956, the plaintiff was given a physical examination for the purpose of separation from the service by Lt. Col. Tillman D. Johnson, a Walter Need Army Hospital doctor. An electrocardiogram made in connection with this examination was normal. A chest S-ray report showed as follows:
(46) X-ray report: There is a single calcified nodule in the right mid lung zone and the second calcified nodule in the left apex. These calcifications have the appearance of old chronic inflammatory disease and not felt to be of clinical significance at this time. The left ventricular segment of the cardiac silhouette is prominent, however, the heart size is within normal limits. The diaphragm, pleura and bony thorax within normal limits.
The summary of defects and diagnosis of plaintiff was noted thus:
(29) Atrial paroxysmal fibrillation unassociated with underlying organic heart disease; cured. LOD: Yes.
(36) Arthritis of interphalangeal joint of left great toe due to infection, organism unknown, incurred in 1943, moderate; unchanged.
(37) Arthritis of right hip joint due to trauma, moderate, LOD: Yes.
(70) Deafness, perceptive, bilateral, moderate, cause undetermined, LOD: Yes.
The plaintiff was found by the examining doctor to be not permanently incapacitated for either general service or limited service and to be qualified for separation.
*152 24. By Special Orders No. 10 of January 16, 1956, of Headquarters, Walter Eeed Army Medical Center, the plaintiff was released from active duty not by reason of physical disability effective January 17, 1956.
25. The plaintiff applied to the Veterans’ Administration for benefits between his release to inactive duty in early 1948 and his recall to active duty in late 1948. Compensation in the sum of $13.80 per month was paid by the Veterans’ Administration from March 2 to November 14, 1948.
26. The plaintiff has, since January 18, 1956, been receiving veterans’ compensation with a 50 percent disability rating. Though it was somewhat less before October 8, 1957, since that time it has amounted to $111.50 per month. Since June 20,1960, when the plaintiff was granted retirement pay after age 60 as a Reserve officer, his retirement pay, together with the veterans’ benefits, totals about $525 per month.
27. Pertinent Army Regulations read in part as follows:
ARMY REGULATION si DEPARTMENT OE THE ARMY No. 40-504 /Washington 25, D.C., 28 Jime 1955
MEDICAL SERVICE
STANDARDS OE ECTNESS AND UNFITNESS FOR RETENTION ON ACTIVE DUTY
*****
SECTION I
PRELIMINARY
1. Purpose. These regulations establish standards of fitness and unfitness for retention on duty to secure the maximum efficiency and uniformity in the determination of disabilities which warrant disability separation or retirement or warrant retention in the military service. These standards of fitness and unfitness apply to all personnel of the Army to include members who are scheduled for mandatory separation or retirement, except for those members who were previously accepted for military service with some of the disabilities listed herein as rendering an individual unfit (e.g., special registrant with diabetes mellitus) in which case retention standards must be modified consistent with pertinent directives and accepted medical principles. All medical *153 examiners, members of medical boards, physical evaluation boards, Army Physical Review Council and Army Physical Disability Appeal Board will utilize these standards when considering member’s eligibility for disability separation or retirement under AR 15-160, AR 40-680? AR 635-40A and AR 635-40B. Each member’s case will be considered on its individual merits, the object being to aid in the determination of whether or not an individual is physically or mentally qualified for further military service.
2. Evaluation of physical disabilities, a. The Career Compensation Act of 1949 provides benefits for those members who have become unfit to perform the duties of their office, rank, grade, or rating by reason of physical disability and who otherwise qualify under the act. Most members possess some physical imperfections which are recorded in the Veterans Administration Schedule for Rating Disabilities, but this act does not provide rights or benefits for physical disability to members who are not determined to be unfit, regardless of the percentage of disability under that schedule from a single disability or accumulation of disabilities. The fact that a member has physical disability which is rateable in accordance with the Veterans Administration Schedule for Rating Disabilities must not be considered a guide in judging fitness or capacity to perform active duty, but this determination is based wholly on the individual’s physical and mental capacity to serve in the military service. The presence of rateable disabilities, though not causing unfitness under the act, may provide rights and benefits under laws administered by the Veterans Administration and should be made a matter of record whenever discovered.
5. In evaluating physical disabilities due regard will be given to the physical standards set forth in AR 40-100, AR 40-105, and AR 40-115. However, the standards prescribed therein will be liberally interpreted in evaluation of members to determine their physical fitness for retention on active duty; thus members may be found qualified for retention on active duty even though they have diseases, injuries, or infirmities which would disqualify them for original appointment or enlistment, provided that such diseases, injuries, or infirmities are—
(1) Of such nature and degree as not to affect adversely the performance of continued duty on any *154 assignment commensurate with the individual’s grade or rating including assignments to positions which may be held by an individual regardless of his basic branch.
(2) Not subject to complications or serious aggravation by reason of continued active duty.
* :¡c ¡Ü # *
SECTION in
EARS
8. Defective hearing. Deafness does not alter a patient’s medical fitness for retention on active duty when the patient’s hearing can be sufficiently improved through rehabilitation and use of a hearing aid to meet the medical fitness standards prescribed lor retention on active duty. No Army member will be considered physically unfit for retention on active duty solely because of hearing defect, provided such defect can be improved by use of hearing aid to a loss of 20 decibels or less in speech reception score. For criteria for the disposition of patients by auditory screening centers, see paragraphs 7, SK 40-530-55.
$ $ ‡
SECTION X
HEART AND VASCUIxAR SYSTEM
$ $ $ ‡ &
36. Arrhythmia, heart Mock. Cardiac arrhythmia, when present in a mild degree and which is discovered at a routine examination and not because of symptons, is usually not considered as rendering an individual unfit, especially when unaccompanied by any other evidence of cardiovascular abnormality. The routine finding of an abnormal electrocardiogram with features diagnosable as a bundle-branch block may well be the result of coronary arteriosclerosis involving the arteries supplying the septal tissues but individuals presenting such an abnormality as the only objective or subjective finding, past or present should ordinarily be considered as fit for duty. The “broad-S type” right bundle-branch block, if asymptomatic, is usually not considered as rendering the individual unfit.

*155 SECTION xm
SPINE AND PELVIS, INCLUDING SACRO-ILIAC AND
LUMBOSACRAL JOINTS
69. Arthritis, a. Arthritis, if relatively asymptomatic, is usually not considered to render an individual unfit.
b. Osteoarthritis is a systemic disease which usually occurs in later life and corresponds to the aging process of the individual. An individual who has only x-ray evidence of osteoarthritis or who has a slight, stiffness or localized soreness or a history of infrequent incapacity should seldom, if ever, be considered as being unfit for retention in the service because of this condition alone. Unfitness from osteoarthritis generally results from limited function or persistent pain associated with appropriate objective x-ray evidence and documented history of recurrent incapacity for prolonged periods. Osteoarthritis originating prior to entry on active duty is considered to have been permanently aggravated by the service only when there is a history of some definite, permanent, local injury or abrupt and sudden pathologic development during active service or where there has been undue exertion, exposure, or other adverse influences of the military service, such that the progression of the disease has been definitely permanently accelerated.
28. On October 15, 1956, plaintiff applied to the Army Board for Correction of Military Records, requesting inter alia, that his records be corrected to show that he was released from active duty by reason of physical disability. Subsequent to receiving the application, the Correction Board requested an advisory opinion from the Physical Standards Division of the Surgeon General’s Office. Plaintiff’s application and accompanying exhibits as well as his Army medical records, and his Veterans’ Administration compensation statement were forwarded along with the request. The reply of the Physical Standards Division to the Correction Board was in pertinent part as follows:
1. The attached records in the case of Franklin W. Patten, 0-168150, have been carefully reviewed.

*156 4. Based upon the evidence of record, the opinion is expressed that while this officer did have physical defects of a degree rateable under the Veterans Administration Schedule for Rating Disabilities, they were not of such nature or degree as would have warranted, his separation or retirement because of physical disability under the rules, regulations, laws, or policies then in effect.
29. By letter of March 1, 1957, plaintiff was informed, in pertinent part, that:
The administrative procedures established by the Sec-retáis of the Army for the guidance of the Army Board for Correction of Military Records provide that the Board may deny an application where a sufficient basis for review has not been established.
Following examination and consideration of your Army records together with such facts as have been presented by you, the Army Board for Correction of Military Records on 13 February 1957, determined that insufficient evidence has been presented to indicate probable material error or injustice. Accordingly, your application was denied.
30. On December 13,1958, plaintiff reapplied to the Board for Correction of Military Records, again requesting that the Board correct his records to show that he retired for physical disability as of January 16, 1956. In his brief in support of his application plaintiff contended inter alia, that:
Auricular fibrillation renders an individual unfit for military duty. Exhibit 2; AR 40-105, 45d; TM 12-245, Chap. 4. The record is clear and definite that Colonel Patten incurred this disease in line of duty, incident to extended active service. See p. 4, supra. The sole issue to be decided by the Board is whether or not the condition was, in fact, cured at the time of his relief from active duty on January 12, 1956. Colonel Patten insists that it was not. Dr. Gibb, a heart specialist of the highest standing, has stated, and will testify, that he first examined Colonel Patten as early as April, 1956, and that, at that time, he was suffering from auricular fibrillation, has suffered from it constantly since, and is still suffering from it. * * *
31.Upon receipt of plaintiff’s reapplication the Correction Board requested the Physical Standards Division of *157 the Surgeon General’s Office, to review the exhibits submitted by plaintiff with his application together with the plaintiff’s military and medical records, and furnish a “comprehensive opinion for the guidance of the Board regarding the medical issues raised by” plaintiff.
32. The Physical Standards Division responded to the Correction Board’s request with a letter of October 23,1959, stating in pertinent part as follows:
1. Records in the case of FRANKLIN w. patteN, O 168 150 have been reviewed in this office.
2. This officer has presented episodes of irregular guise since at least 1947 at which time he was found to ave extra-systoles. (Premature auricular contractions.) In 1955, in Austria he experienced an attack of paroxysmal auricular fibrillation and again later in that year he was treated for this condition at WRAH. In both instances a normal sinus rhythm was restored without difficulty and no evidence of accompanying cardiac disease was demonstrated. Also considered during the WRAH hospitalization were arthritis of the hip which had existed since a dislocation in 1943 and arthritis of the great toe also of about twelve year’s duration. Neither of these long-standing arthritic conditions was considered to be unfitting for service. Also the loss of hearing affecting chiefly the upper register was well within the limits established by regulation for retention in the service.
3. Contrary to statement by counsel in his Statement of the Case (Appendix A) on page 6, auricular fibrillation does not render an individual unfit for military duty. The references quoted by counsel are both inapplicable; TM 12-45 published in 1945, has not been in use since 1949. AR 40-105 established physical standards for original commission in the Regular Army and Organized Reserves and was not used as a standard for retention in the service, the proper pertinent Regulation being AR 40-504. Also, par 45d of AR 40-105 does not deal with auricular fibrillation but with paroxysmal tachycardia, an entirely different abnormality of the pulse. A cardiac arrthymia when not accompanied by other evidence of cardiovascular abnormality is not considered unfitting for further service UP AR 40-504. The VA award of compensation obviously has no relation to fitness for service although the various conditions concerned are ratable under the VA Schedule and clearly service connected.
*158 4. It is the opinion of this office that the record fails to support the contention of error or injustice in the medical aspects of this applicant’s separation from the service in 1956. * * *
33. On November 9, 1959, the Correction Board informed plaintiff’s attorney in pertinent part that:
Colonel Patten’s Army records, including records from the Veterans Administration, and his re-application together with the brief and exhibits submitted in support thereof were reconsidered by the Army Board for Correction of Military Becords on 4 November 1959. It was the Board’s decision that insufficient evidence had been presented to indicate probable material error or injustice in his failure to be retired for physical disability on 17 January 1956. The action taken by the Board in rejecting his original application on 13 February 1957, was affirmed.
34. Dr. William Travis Gibb, Jr., a specialist in internal medicine, with high professional qualifications, examined the plaintiff first on April 28,1956, upon his complaints of tiring easily, dizziness, nausea, and ears ringing all the time. A complete physical examination was made with blood count, chest X-ray, and electrocardiogram. The diagnosis made by Dr. Gibb at the conclusion of this examination was that the plaintiff had auricular fibrillation, etiology not apparent, advanced arteriorsclerosis, anal fissure, osteoarthritis, and an allergy consisting of a tendency towards asthma.
Dr. Gibb saw the plaintiff 12 times between April 28,1956, and March 4, 1957, and prescribed medication for him beginning with digitalis on the first visit. These visits and treatment continued thereafter as Dr. Gibb reported, “[n]ot at fairly regular intervals, but I have seen him many times.”
Dr. Gibb, having had naval service during World War II, gave it as his opinion that on April 28, 1956, the plaintiff was not fit for full Navy duty though perhaps he might be fit for limited duty. This opinion was based generally on his experience as a Navy medical officer, not on a naval regulation as to fitness for duty.
35. The defendant called two Army medical doctors with high professional qualifications. Dr. Bobert J. Hall, a specialist in internal medicine, although he had never examined *159 the plaintiff, had reviewed the plaintiff’s medical records. It was his opinion that, based upon such review, in light of the Army standards for fitness for duty, plaintiff’s atrial fibrillation at the time of his release to inactive duty, did not render him unfit for duty from a cardiovascular standpoint.
Dr. Charles Walter Metz, whose specialty was as an orthopedic surgeon, although he had never examined the plaintiff, reviewed the plaintiff’s medical records. It was his opinion that, based on such review in the light of the Army standards of fitness for duty, the arthritis of plaintiff’s right hip joint and left great toe did not render him unfit for duty on January 16, 1956.
36. Neither side offered any testimony as to the plaintiff’s hearing.
37. The final action of the Army Board for Correction of Military Records, in plaintiff’s case, was based upon substantial evidence. No finding relating to arbitrary action is made since no allegation of such action is made.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and his petition is dismissed.

 Dorland, American Illustrated Medical Dictionary, 22 Ed. 1951.

 Electrocardiogram.