Per Curiam: :
Tbis case was referred to Trial Commissioner Mastín G. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on January 27, 1967. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion and recommended conclusion of law of the commissioner, with modifications, it hereby adopts the same as modified as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.
Commissioner White’s opinion,* as modified by the court, is as follows:
The plaintiff is the widow of Allan A. Jacobs, a physician, who was commissioned at the age of 30 as an Assistant Surgeon in the Deserve Corps of the U.S. Public Plealth Service on November 4, 1942, who was detailed to active duty as a medical officer with the U.S. Coast Guard on November 5, 1942, who continued to serve in that capacity until he was released from active duty with the Coast Guard, under the point system, as of the close of business on June 29,1946, and who received an honorable discharge from the Public Health Service on July 10, 1946. Dr. Jacobs later died on April 16, 1964.
The plaintiff claims that her husband, because of a heart condition, was permanently incapacitated for active service when he was released from active duty with the Coast Guard and when he was honorably discharged from his commission as a Deserve officer of the Public Health Service; and, accordingly, that he was entitled to disability retirement pay for the period between such discharge and his death.
The plaintiff contends that the question of Dr. Jacobs’ entitlement to disability retirement pay as of the time of his release from active wartime duty with the Coast Guard *1143 should be determined “under the Act of April 3,1939,” as construed in numerous cases decided by this court and cited by the plaintiff. The quoted statutory reference is understood as referring to the last proviso of Section 1 of the Act of August 30,1935 (49 Stat. 1028), as amended by Section 5 of the Act of April 3, 1939 (53 Stat. 555, 557), by the Act of July 25,1939 (53 Stat. 1079), and by the Act of December 10, 1941 (55 Stat. 796). This proviso was codified in the 1946 edition of the United States Code as 10 U.S.C. § 456, reading in part as follows:
All officers * * * of the Army of the United States, other than the officers * * * of the Regular Army, if called or ordered into the active military service by the Federal Government for extended military service in excess of thirty days, * * * and who suffer disability * * * in line of duty from disease or injury while so employed shall be deemed to have been in the active military service during such period and shall be in all respects entitled to receive the same * * * retirement pay * * * as * * * [is] now or may hereafter be provided by law or regulation for officers * * * of corresponding grades and length of service of the Regular Army * * h[1]
It will be noted that the statutory provision quoted in the preceding paragraph was applicable to officers of the Army of the United States (except Regular Army officers), and did not refer to officers of the other military services. Dr. Jacobs was not an officer of the Army of the United States, and he did not perform any active wartime duty with the Army. Dr. Jacobs was a Reserve officer of the Public Health Service, and he was detailed to active wartime duty with the Coast Guard.
While Dr. Jacobs was serving with the Coast Guard, there was enacted the Act of November 11, 1943 (57 Stat. 587), relating to the organization and functions of the Public Health Service. Section 8(b)(2) of this statute (57 Stat. at page 589) provided that while commissioned officers of the Public Health Service, regular or reserve, “are detailed *1144 for duty with the Army, Navy, or Coast Guard, [such officers] shall be entitled to full military benefits with respect to such duty.” Section 8(a)(1) of the same statute (57 Stat. at page 588) defined the term “full military benefits” to mean—
* * * all rights, privileges, immunities, and benefits provided under any law of the United States in the case of commissioned military and naval personnel of the United States * * * on account of active military or naval service, including, but not limited to, * * * retirement, including retirement for disability * * *.
It apparently was the intention of the Congress, in enacting the statutory provisions quoted in the preceding paragraph, that an officer of the Public Health Service, while detailed, for duty with the Army, Navy, or Coast Guard, should be eligible for retirement, including disability retirement, on the same basis as officers of the particular military service with which he was serving.
However, the Act of November 11,1943 was on the statute books only a few months before it was repealed and superseded by the Public Health Service Act of July 1,1944 (58 Stat. 682). This change occurred before the happening of any of the events on which the present claim is based. Section 212(b) (2) of the 1944 statute (58 Stat. at page 689) provided, in language similar to that previously used in Section 8(b) (2) of the 1943 statute, that commissioned officers of the Public Health Service “shall be entitled to full military benefits with respect to active service performed while detailed for duty with the Army, Navy, or Coast Guard,” but, from the standpoint of the present case, Section 212(a) (1) of the 1944 statute made a crucial change in defining the term “full military benefits.” The new definition declared that the term “full military benefits”—
* * * means all rights, privileges, immunities, and benefits provided under any law of the United States in the case of commissioned officers of the Army * * * on account of active military service * * *; excluding, however, retired pay * * *.[2] [Emphasis supplied.]
*1145 Thus, Congress clearly provided in the 1944 statute — using plain, unambiguous language for tbe purpose — that thereafter the “full military benefits” to be accorded officers of the Public Health Service detailed for duty with the military services should not include retired pay. The reason for this exclusion was that the 1944 statute itself contained specific provisions relating to the retirement of officers of the Public Health Service, including retirement for disability incurred as an incident of wartime duty.
Prior to the enactment of the Public Health Service Act of July 1,1944, officers of the Public Health Service detailed for duty with the Army, Navy, or Coast Guard were, as previously indicated, entitled to retirement, including disability retirement, on the same basis as officers of the respective military services; and other officers of the Public Health Service were subject to the general retirement system provided for civil service personnel of the Federal Government. However, in Section 211 of the 1944 statute (58 Stat. at page 688; 42 U.S.C. §212 (1946)), the Congress enacted a set of retirement provisions for all officers of the Public Health Service. The significant portion of Section 211 from the standpoint of the present case was subsection (a), which provided in part as follows:
(a) A commissioned officer of the Kegular Corps retired for disability from disease or injury incurred in line of duty, or a commissioned officer of the Eeserve Corps retired for disability from disease or injury incurred m line of duty in time of war, shall be entitled * * * to receive retired pay at the rate of 75 per centum of his active pay at the time of retirement.
The provisions of the Public Health Service Act of July 1, 1944 previously mentioned were the pertinent statutory provisions in effect when Dr. Jacobs was released from active wartime duty with the Coast Guard and when he was honorably discharged from his commission as a Eeserve officer of the Public Health Service.[3]
*1146 Section 211(a) of tbe Public Health Sendee Act of July 1,1944, dealing with the subject of disability retirement for officers of the Public Health Service, did not prescribe any standard or any procedure for use in determining whether an officer was entitled to disability retirement. However, the statute was augmented on November 14,1945 by the issuance of Executive Order 9655 (8 CFR. 1948-1948 Comp., p. 452), which promulgated an extensive set of regulations relating to the personnel of the Public Plealth Service.[4] Sub-part J of part 2 of the Executive order prescribed a number of provisions (§§ 2.171-2.184) relating to the retirement of officers of the Public Plealth Service for disability.
Section 2.172 of Executive Order 9655 declared that—
An officer shall be retired for service-connected total disability determined to exist in accordance with these regulations.
Section 2.171(d) of the order defined “total disability” to mean—
* * * a disability which has continued for 90 days and which totally disables an officer for the useful and efficient performance of the duties of his grade.
Section 2.179 of the order provided for the appointment by the Surgeon General of a board of three or more officers to consider the entitlement of officers to disability retirement, and conferred appropriate powers upon such board.
The evidence in the record shows that under the date of September 13, 1963, Dr. Jacobs submitted to the Public Health Service an application, with supporting documentary material, for disability retirement as of the time of his release from active wartime duty. The Medical Review Board of the Public Health Service considered the application. The Board found that Dr. Jacobs was not totally disabled for duty at the time when he left the Public Plealth Service, and the Board held that he was not entitled to disability retirement. Later, the Board, on request, reconsidered its previous determination concerning Dr. Jacobs’ application for disability retirement, and reaffirmed the correctness of such determination.
*1147 The finding by the Medical Review Board to the effect that Dr. Jacobs was not totally disabled for the useful and efficient performance of the duties of his grade at the conclusion of his active wartime service as a Reserve officer of the Public Health Service is supported by substantial evidence.
Tiie fitness of a person for duty must be determined in relation to the duties to be performed by him. Patten v. United States, 161 Ct. Cl. 131 (1963); Gordon v. United States, 162 Ct. Cl. 740 (1963). Dr. Jacobs was a physician and performed the duties of a medical officer while serving with the Coast Guard. In this connection, the evidence in the record shows that he was physically capable of performing—and that he actually did perform—the full duties of such an officer with a very high degree of medical efficiency during his period of active wartime service with the Coast Guard. He was hard-working, conscientious, resourceful, and effective.
It is true that, while Dr. Jacobs was assigned to the Coast Guard Separation Center in New Orleans, Louisiana, he went to the out-patient department of the U.S. Marine Hospital in New Orleans on May 27,1946 in the role of a patient, complaining of precordial pain (i.e., chest pain in the region over the heart or stomach), palpitation, and pain radiating down the left arm. Tests, including X-rays and an electrocardiogram, were made of Dr. Jacobs during the period May 29-31, 1946. The tracings on the electrocardiogram, which was made on May 31, 1946, were normal, and did not disclose any abnormality in the condition or functioning of the heart.
Several weeks later, preparatory to his release from active wartime duty with the Coast Guard, Dr. Jacobs was given a physical examination by medical officers on June 24, 1946 in New Orleans. The report of the physical examina-ation indicated that Dr. Jacobs’ heart and blood vessels were normal.
In connection with Dr. Jacobs’ release from active wartime duty with the Coast Guard in late June of 1946, he signed a certificate on June 27, 1946 relative to his physical defects of winch he had knowledge. There was no reference in the certificate to a heart condition.
*1148 The evidence in the record clearly shows that, subsequent to his release from active wartime duty with the Coast Guard, Dr. Jacobs, with his medical knowledge and experience, regarded himself as being physically able to perform-and he actually did perform—the full duties of a hospital resident physician, working in the field of ophthalmology, although he sometimes complained of the pace of the work and of indigestion, and on occasions he showed the effects of fatigue.
On May 18, 1948, while Dr. Jacobs was working as a resident physician in the field of ophthalmology at the Sea View Hospital on Staten Island, New York, he suffered the onset of a severe heart attack, and was hospitalized. A series of electrocardiograms made during the period May 13-June 16,1948 revealed that the heart attack consisted of a coronary occlusion (i.e., the stoppage or closure of a blood vessel supplying blood, nutrition, and oxygen to a portion of the heart muscle), resulting in an acute myocardial infarct (i.e., serious and permanent damage to the portion of the heart muscle thus deprived of blood, nutrition, and oxygen).
On November 22, 1948, pursuant to a claim filed by Dr. Jacobs, the Veterans Administration determined that he was suffering from a service-connected arteriosclerotic heart disease, with a disability rating of zero percent from July 11, 1946 (the day after Dr. Jacobs was honorably discharged from his commission as a Reserve officer of the Public Health Service) until September 16, 1948, and with a disability rating of 30 percent as of September 17,1948. Following another heart attack which Dr. Jacobs had in April 1951, the Veterans Administration increased his disability rating for heart disease from 30 percent to 100 percent as of June 21, 1951. Later, Dr. Jacobs’ disability rating for heart disease was decreased by the Veterans Administration from 100 percent to 60 percent as of December 1, 1952; and then it was increased from 60 percent to 80 percent as of August 27,1962. The 80-percent rating was continued until Dr. Jacobs’ death on April 16,1964 of coronary sclerosis.
The tracings on the electrocardiograms that were made of Dr. Jacobs during the period May 13-June 16,1948 not only disclosed the severe heart attack which Dr. Jacobs suffered beginning on May 13,1948, but the tracings also disclosed the *1149 existence of a small scar in the heart mnscle from an earlier myocardial infarct that Dr. Jacobs had experienced sometime prior to May 13, 1948. Therefore, it is inferred that the symptoms of precordial pain, etc., experienced by Dr. Jacobs on May 27,1946, while serving with the Coast Guard, indicated that he was experiencing an episode of angina pectoris; that this was a warning signal that a blood vessel supplying blood, nutrition, and oxygen to a portion of the heart muscle was in the process of narrowing, and the affected portion of the heart muscle was suffering, at least temporarily, from a deficiency of blood, nutrition, and oxygen; that at some later time, the closure of such coronary blood vessel was completed, causing a myocardial infarct; and that this heart attack was so mild that Dr. Jacobs, a physician, was unaware of the coronary occlusion and resulting myocardial infarct. The occurrence of the coronary occlusion and myocardial infarct just referred to cannot be fixed as to time, except that it had not been manifested as of the time when the electrocardiogram was made of Dr. Jacobs on May 31, 1946, and it antedated May 13,1948.
Despite the heart difficulty mentioned in the preceding paragraph as having developed prior to May 13, 1948, the evidence in the record indicates that, at the time of his release from active duty, Dr. Jacobs was not totally disabled from performing the duties of a military or civilian physician. It must be remembered that the standard to be applied in this case is not the normal military standard, but the higher criterion of “total disability.” On the whole record, the court cannot conclude that the Medical Keview Board of the Public Health Service lacked substantial evidence to sustain its conclusion that Dr. Jacobs was not totally disabled at the time of his release. On the contrary, there is substantial evidence that he performed his duties adequately and, at that time, was sufficiently capable of performing those duties that he would not have to be called totally disabled. The court recognizes that the mere fact that one performs his work does not necessarily negative the existence of total disability (see, e.g. United States v. Still, 120 F. 2d 876, 880 (4th Cir., 1941), cert denied, 314 U.S. 671; United States v. Holland, 111 F. 2d 949, 953 (9th Cir. 1940)), but here there is *1150 substantial evidence that during that period Dr. Jacobs was capable of performing his assigned medical duties without further injury to his health or danger to life. Whatever may have been the case if the ordinary military standards were applicable, there was no error in holding that he was not totally disabled.
As the evidence in the record fails to establish that Dr. J acobs was totally disabled for the useful and efficient performance of the duties of his grade at the time when his wartime service as a Reserve officer of the Public Health Service ended, it is concluded that Dr. Jacobs was not entitled to disability retirement as of that time under Section 211 (a) of the Public Health Sendee Act of July 1, 1944 and the supplementary regulations contained in subpart J of part 2 of Executive Order 9655, these being the provisions of law governing Dr. Jacobs’ case, since they were in effect when he experienced the episode of angina pectoris on May 27, 1946, when he was released from active wartime duty with the Coast Guard on June 29, 1946, and when he was honorably discharged from his commission as Reserve officer of the Public Health Service on July 10,1946.
Accordingly, the plaintiff is not entitled to recover in the present action, and the petition should be dismissed.
ColliNS, Judge, took no part in the decision of this case.
FINDINGS of Fact
1. The plaintiff is a resident of the State of New York. She is the widow of Allan A. J acobs, who died on April 16, 1964.
2. On November 4,1942, Allan A. J acobs, a medical doctor 30 years old, was commissioned as an Assistant Surgeon in the Reserve Corps of the U.S. Public Health Service. (For the sake of convenience, Allan A. Jacobs will usually be referred to hereafter in the findings as “Dr. Jacobs.”)
3. (a) On November 5, 1942, Dr. Jacobs was detailed to active duty as a medical officer with the U.S. Coast Guard.
(b) Sometime in November 1942, Dr. Jacobs was assigned to the position of Medical Officer in Charge, Office of the Captain of the Port, at Houston, Texas. He continued to *1151 perform the duties of this position until sometime in December 1945.
(c) While serving in the position referred to in paragraph (b)of this finding, Dr. Jacobs was promoted to the grade of Passed Assistant Surgeon on June 4,1944.
(d) From the position mentioned in paragraph (b) of this finding, Dr. Jacobs was transferred to a duty assignment at the Coast Guard Separation Center in New Orleans, Louisiana. He was on duty there from sometime in December 1945 until he was relieved from active duty with the Coast Guard, under the point system, as of the close of business on June 29, 1946.
(e) On July 10, 1946, Dr. Jacobs received an honorable discharge as a commissioned officer on active duty in the Reserve Corps of the U.S. Public Health Service. At the time of his discharge, Dr. Jacobs was in the grade of Senior Assistant Surgeon, which is equivalent to the grade of Captain in the United States Army.
4. During his period of active wartime service with the Coast Guard, Dr. Jacobs performed his duties with a very high degree of medical efficiency. He was hard-working, conscientious, resourceful, and effective.
5. While assigned to the Coast Guard Separation Center in New Orleans, Dr. Jacobs went to the out-patient department of the U.S. Marine Hospital in New Orleans on May 27, 1946 in the role of a patient. He complained of pre-cordial pain (i.e., chest pain in the region over the heart or stomach), palpitation, and pain radiating down the left arm.
6. (a) Tests, including X-rays and an electrocardiogram, were made of Dr. Jacobs in the out-patient department of the U.S. Marine Hospital at New Orleans during the period May 29-31,1946.
(b) The tracings on the electrocardiogram, which was made on May 31,1946, were normal, and did not disclose any abnormality in the condition or functioning of the heart.
(c) An X-ray of the dorsal spine indicated slight hyper-trophic arthritic changes.
(d) The diagnosis resulting from the tests mentioned in this finding was hypertrophic arthritis.
*1152 7. Preparatory to bis release from active wartime duty with the Coast Guard, Dr. Jacobs was given a physical examination by medical officers on June 24,1946 in New Orleans. He was found to be physically qualified for separation, with a history of arthritis antedating his wartime service. The report of the physical examination indicated that Dr. Jacobs’ heart and blood vessels were normal.
8. In connection with Dr. Jacobs’ release from active wartime duty with the Coast Guard in late June of 1946, Dr. Jacobs certified on June 27, 1946 that, to the best of his knowledge and belief, he had the following physical defects: hypertrophic arthritis; myofibrositis; pes planus; vernal conjunctivitis; and astigmatism. There was no reference in the certificate to a heart condition.
9. (a) Upon being relieved from active duty with the Coast Guard, Dr. Jacobs went from New Orleans to his home in Brooklyn, New York. Shortly thereafter, Dr. Jacobs accepted a residency in ophthalmology at the U.S. Marine Hospital in New Orleans. The residency was connected with Tulane University. Consequently, he returned to New Orleans sometime during the first week in August of 1946.
(b) In letters written from New Orleans during August 1946 to his fiancee (the present plaintiff) in New York, Dr. Jacobs indicated that he “couldn’t take” the New Orleans climate or the pace of the work in the hospital.
10. Dr. Jacobs left the residency in ophthalmology at the U.S. Marine Hospital in New Orleans after a few weeks, and went to New York. He arrived there during the Labor Day weekend of 1946.
11. Dr. Jacobs and the plaintiff were married in New York on November 17, 1946. During the interval between the Labor Day weekend (when Dr. Jacobs returned to New York from New Orleans) and the time of his marriage to the plaintiff, Dr. Jacobs did not do any work. He was resting and “taking it easy” during this period.
12. Following their marriage, Dr. Jacobs and the plaintiff went to Miami Beach, Florida, on their honeymoon. They spent two weeks in Miami Beach. It was Dr. Jacobs’ practice during the honeymoon period to spend each afternoon in his room resting, while the plaintiff was with other persons *1153 on the beach. Dr. Jacobs gave as his explanation for this practice that “the sun was too hot.” Although he was a very-good swimmer, Dr. Jacobs did not do any swimming while at Miami Beach.
13. Dr. Jacobs and the plaintiff returned to New York from Miami Beach around the end of November 1946. They remained in New York until May of 1947. Dr. Jacobs did not do any work during this period.
14. In May of 1947, Dr. J acobs and the plaintiff went to Portland, Maine, where Dr. Jacobs took courses at an oph-thalmological study council until the first week in September 1947. It was Dr. J acobs’ daily practice during this period to attend classes from 9 to 12 in the morning, then have lunch with the plaintiff, then attend classes until 3 or 4 o’clock in the afternoon, and then go to bed and stay in bed for the rest of the day. He was very pale at the time, and also very nervous. He seemed to have difficulty keeping warm, and slept in a sweater many nights.
15. Dr. Jacobs accepted a residency in ophthalmology at the Sea View Hospital on Staten Island, New York, and he began his work there in October of 1947. He continued in this residency until May 1948. During this period, he complained of indigestion a few times. On weekends, Dr. Jacobs showed the effects of fatigue.
16. (a) In the fall of 1947, while Dr. Jacobs was engaged in the residency mentioned in finding 15, he applied to the Veterans Administration for a disability rating. Dr. Jacobs based the claim upon eye trouble that allegedly was incurred in 1943, upon myositis of the neck and right face that allegedly was incurred in 1944, and upon arthritis of the dorsal spine that allegedly was incurred in 1946. In submitting his claim, Dr. Jacobs did not assert that he suffered from any sort of heart difficulty.
(b) Dr. Jacobs was given a physical examination by medical officials of the Veterans Administration on December 9, 1947 in connection with the claim mentioned in paragraph (a) of this finding.
(c) Upon the basis of the application and examination referred to in paragraphs (a) and (b) of this finding, the Veterans Administration on January 28, 1948 awarded Dr. *1154 Jacobs a 10-percent disability rating on account of hyper-trophic arthritis of the dorsal spine.
17. On May 13,1948, while Dr. Jacobs was engaged in the residency at the Sea View Hospital mentioned in finding 15, he suffered the onset of a severe heart attack and was hospitalized. A series of electrocardiograms made during the period May 13-June 16, 1948 revealed that the heart attack consisted of a coronary occlusion (i.e., the stoppage or closure of a blood vessel supplying blood, nutrition, and oxygen to a portion of the heart muscle), resulting in an acute myocardial infarct (i.e., serious and permanent damage to the portion of the heart muscle thus deprived of blood, nutrition, and oxygen).
18. Dr. Jacobs remained in the hospital about 2 months as a result of the heart attack that began on May 13, 1948. After leaving the hospital, Dr. Jacobs recuperated at his home for approximately 5 months.
19. Dr. Jacobs did not return to the residency at the Sea View Hospital.
20. Following the hospitalization and recuperation referred to in findings 17 and 18, Dr. Jacobs obtained a medical position with the Veterans Administration. He worked full-time as a physician in the field of opthalmology at a branch installation of the Veterans Administration in New York City for approximately a year.
21. (a) In a letter dated August 31, 1948 and addressed to the [Regional Office of the Veterans Administration in Brooklyn, New York, Dr. Jacobs informed the agency of his heart attack on May 13,1948, and he stated that while on active duty with the Coast Guard, he had “experienced sym-toms exactly similar to those I experienced during this recent coronary attack, namely, sudden generalized weakness associated with profuse cold sweat, and pains in the chest, back, and left arm.”
,(b) In support of Dr. Jacob’s claim that he had sustained a heart attack while serving on active duty with the Coast Guard, the following materials were submitted to the Veterans Administration:
(1) A letter dated October 7, 1948 from Rudy T. Schlesinger, Jr., to the effect that he, as Chief Pharma *1155 cist, had served with Dr. J acobs during the latter’s period of duty at the Coast Guard Separation Center in New Orleans; that he noticed shortly after Dr. Jacobs’ arrival at the station that Dr. Jacobs became easily fatigued while performing his daily routine duties; that Dr. Jacobs occasionally became breathless, weak, and dizzy for no apparent reason and seemed to experience relief only by resting; that Dr. J acobs often complained of generalized aches and pains in his chest, which at times were associated with nausea; and that Dr. Jacobs rarely participated in any of the sports or calisthenics that were offered by the Physical Education and Recreation Divisions of the station.
(2) An affidavit dated October 22, 1948 by Frank M. Jones to the effect that, as a member of the Coast Guard Reserve, he was transferred to the Office of the Captain of the Port at Houston, Texas, on or about February 1, 1944; that he became acquainted with Dr. Jacobs immediately following his arrival there; that he often observed Dr. Jacobs, late in the afternoons, stretched out on a cot and giving every indication of being completely exhausted; that Dr. Jacobs often spoke of being very tired, and on one occasion mentioned cramping sensations in his chest; and that Dr. J acobs was subject to call at all times, and labored under considerable strain.
(3) An affidavit dated October 22, 1948 by Milton H. Wyner to the effect that, while serving as a Coast Guard Reserve officer at Houston, Texas, he was personally acquainted with Dr. J acobs during the period from J anuary to December of 1945; that he saw Dr. J acobs during this period almost every day; that he observed that Dr. Jacobs became breathless when walking even short distances, and was required to rest frequently; that Dr. Jacobs frequently complained of chest pains and weakness; that Dr. J acobs once stated that he had broken out in a cold sweat; and that Dr. Jacobs spent much of his off-duty time resting, and did not take part in any physical exertion.
(4) A statement dated October 14, 1948 from Dr. Theodore T. Fox, a specialist in cardiology, expressing the opinion that Dr. Jacobs had “sustained a coronary insult” prior to the heart attack of May 13, 1948, and giving as the reason for the opinion that the electrocardiogram that was taken of Dr. Jacobs on May 13, 1948 “presented a small Q-2 and Q-3, which I interpreted as due to an old lesion.”
(5) A letter dated September 13, 1948 from Dr. Elliott L. Kaplan, resident in cardiology at the Sea *1156 View Hospital, giving detailed information concerning Dr. Jacobs’ heart attack that began on May 13, 1948.
(6) A statement dated October 25, 1948 from Dr. Maxwell P. Taff, a physician practicing in Brooklyn, New York, to the effect that Dr. Jacobs visited him for medical care on November 5, 1946 and on February 10 and May 25,1947; that Dr. Jacobs complained of breathlessness, dizziness, and pains over his chest, which occasionally radiated down the left arm; that Dr. Taff recommended to Dr. Jacobs that the latter limit his physical activity and, if this routine failed, that he should return for further investigation.
(7) Electrocardiograms of Dr. Jacobs taken in 1946 and m 1948, as indicated in findings 6 and 17.
(c) On November 22, 1948, the Veterans Administration determined-that Dr. Jacobs was suffering from a service-connected arteriosclerotic heart disease, with a disability rating of zero percent from July 11, 1946 until September 16, 1948, and with a disability rating of 30 percent as of September 17, 1948. With the 10 percent disability rating for hypertrophic arthritis of the dorsal spine previously awarded Dr. Jacobs by the Veterans Administration (see finding 16), he was given a 40 percent combined disability rating as of September 17,1948.
22. After working for the Veterans Administration for approximately a year, Dr. Jacobs concluded that he was physically incapable of working full-time as a physician. He left the employ of the Veterans Administration and took a vacation for about 6 months. He then opened his own office for the private practice of medicine, working in the field of ophthalmology. The plaintiff worked as his office assistant, and they obtained an apartment near the office.
23. After Dr. Jacobs had been in the private practice of medicine for 6 or 7 months, he had another heart attack, which occurred in April 1951. He was hospitalized for several weeks as a result of this heart attack, and he then recuperated at his home for a period of approximately a month.
24. There was submitted to the Veterans Administration a letter dated June 8, 1951 from the superintendent of the Wyckoff Heights Hospital in Brooklyn relative to the admission of Dr. Jacobs to that hospital on April 16,1951 with a complaint relative to a severe pain over the precordium, which *1157 radiated down the left arm to the fingers, associated with weakness. The letter stated that an electrocardiogram revealed an old posterior coronary occlusion with a superimposed new anterior coronary occlusion with infarction. The letter further said that the patient had been kept in bed for 3 weeks, and had then been sent home on May 16,1951.
25. Following Dr. Jacobs’ heart attack in 1951 (see findings 23 and 24), his disability rating for arteriosclerotic heart disease was increased by the Veterans Administration from 30 percent to 100 percent as of June 21,1951.
26. Following his recuperation from the 1951 heart attack, Dr. Jacobs resumed his career in the private practice of medicine. However, he gave up the office which he had formerly occupied, and he and Mrs. Jacobs bought a combination home and office. This was to facilitate periods of rest by Dr. Jacobs. It was Dr. Jacobs’ custom during the remainder of his career to have office hours three days a week from 9 until 12 in the morning; then to eat lunch; and then to retire to the upstairs portion of the house about 2 o’clock and rest until about 6 o’clock.
27. There was furnished to the Veterans Administration under the date of May 23,1952 a report by the Hospital for Joint Diseases in New York City relative to the hospitalization of Dr. Jacobs from February 3 to February 7,1952, because of complaints of precordial pain on January 31 and February 3, 1952. The report said that an examination revealed “a faint apical systolic murmer,” but that serial electrocardiograms revealed no evidence of acute myocardial damage.
28. On June 11, 1952, the Veterans Administration confirmed and continued Dr. Jacobs’ disability rating of 100 percent (see finding 25).
29. Dr. Jacobs’ disability rating for coronary arterio-sclerotic heart disease, with myocardial damage and posterior wall infarction, was decreased by the Veterans Administration from 100 percent to 60 percent as of December 1,1952.
30. On September 10,1962, Dr. Theodore T. Fox wrote to the Veterans Administration concerning an acute attack of pulmonary edema suffered by Dr. Jacobs on August 7,1962.
*1158 31. Dr. Jacobs’ disability rating for arteriosclerotic heart disease was increased by the Veterans Administration from 60 percent to 80 percent as of August 27,1962.
32. (a) Under the date of March 13,1963, Dr. Jacobs submitted to the Board for Correction of Coast Guard Records an “Application for Correction of Military or Naval Record,” asserting that he should have been retired for a service-incurred physical disability at the time of his release from active duty with the Coast Guard.
(b) In support of the application referred to in paragraph (a) of this finding, Dr. Jacobs submitted:
(1) An affidavit by Dr. Jacobs dated March 13, 1963 to the effect that while on active duty with the Coast Guard during World War II, he was assigned to field stations for the most part, where he was the only medical officer; that the work-load was heavy and could not be shared; that when the symptoms of his condition — i.e., tiredness, chest pains, and shortness of breath — first appeared, he treated himself by resting as much 'as possible; that later, when the symptoms persisted and progressed, he reported to the U.S. Marine Hospital in New Orleans for an electrocardiogram; that at the time when the electrocardiogram was made, his tiredness had progressed to the point where it was only with the greatest effort that he reported for duty; and that he spent most of his off-duty time resting in bed.
(2) The records of the Veterans Administration concerning Dr. Jacobs’ case, including the materials referred to in previous findings as having been submitted to the Veterans Administration in support of Dr. Jacobs’ claims for disability ratings.
(c) On March 21, 1963, the application referred to in paragraph (a) of this finding was disapproved on the ground that Dr. Jacobs had not been a member of the Coast Guard at any time, and that the relief sought in the application was beyond the jurisdiction of the Board for Correction of Coast Guard Records.
(d) On June 4, 1963, the Board for Correction of Coast Guard Records reaffirmed its determination that it lacked jurisdiction to grant the relief requested by Dr. Jacobs.
33. Under the date of September 13,1963, Dr. Jacobs submitted to the U.S. Public Health Service an application for medical retirement as of the time of his release from active *1159 wartime duty with the Coast Guard. In support of tbe application, Dr. Jacobs furnished the materials (or copies thereof) that had previously been submitted to the Board for Correction of Coast Guard Records.
34. (a) The Medical Review Board of the Public Health Service on November 6,1963 considered Dr. Jacobs’ application for medical retirement, but found him physically qualified.
(b) The basic conclusions of the Board were to the following effecffi
(1) Dr. J acobs probably had angina pectoris while on duty with the Public Health Service.
(2) There was not adequate evidence that Dr. Jacobs suffered a myocardial infarct while on active duty.
(3) There was no evidence that Dr. Jacobs was unfit for duty at the time when he left the Public Health Service.
(4) There was evidence that, subsequent to Dr. Jacobs’ separation from the service, he was fit for the usual duties of a physician up until the onset of a myocardial infarct in May 1948.
(c) The Medical Review Board’s report ended with the following paragraph:
Thus the Board believes the action permitting this officer to terminate was correct. It appears that he probably had angina while on duty but this was not of sufficient magnitude to totally disable him for duty as required by the pertinent regulation nor to qualify him for medical retirement.
33. Dr. J acobs was informed on February 18,1964 of the determination by the Medical Review Board of the Public Health Service.
36. Dr. J acobs died on April 16,1964 of coronary sclerosis. He was 51 years of age at the time of his death.
37. The Medical Review Board of the Public Health Service, upon request, reconsidered its previous determination concerning Dr. Jacobs’ application for medical retirement. In a report dated November 4,1964, the Board stated that it was “unanimous in the belief that the action permitting this officer to terminate his commission was correct under the pertinent laws in effect at that time.”
*1160 38. The plaintiff was informed by the Assistant Surgeon General for Personnel under the date of February 25, 1965 regarding the final rejection of Dr. J acobs’ claim for medical retirement.
39. The tracings on the electrocardiograms that were made during the period May 13-June 16,1948 (see finding 17) not only disclosed the severe heart attack which Dr. Jacobs suffered beginning on May 13, 1948, but the tracings also disclosed the existence of a small scar in the heart muscle from an earlier myocardial infarct that Dr. Jacobs had experienced sometime prior to May 13,1948.
40. It is inferred that the symptoms experienced by Dr. Jacobs on May 27,1946 (see finding 5) amounted to angina pectoris and constituted a warning signal that a blood vessel supplying blood, nutrition, and oxygen to a portion of the heart muscle was in the process of narrowing, and the affected portion of the heart muscle was experiencing, at least temporarily, a deficiency of blood, nutrition, and oxygen; that at some later time, the closure of such coronary blood vessel was completed, causing a myocardial infarct; and that this later heart attack was so mild that Dr. J acobs, a physician, was unaware of the coronary occlusion and myocardial infarct. The occurrence of the coronary occlusion and myocardial infarct referred to in this finding cannot be fixed as to time, except that it had not been manifested as of the time when the electrocardiogram was made of Dr. Jacobs on May 31,1946 (see finding 6), and it antedated May Í3,1948.
41. The evidence in the record does not establish that Dr. Jacobs was totally disabled for the useful and efficient performance of the duties of his grade at the end of his wartime service as a Deserve officer of the Public Health Service.
CONCLUSION OK Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 With respect to officers of the Regular Army, it was provided as of 1946 that when such an officer was found by a retiring board to be “incapacitated for active service, and that his incapacity is the result of an incident of service,” he should be retired from active service and should thereafter receive 75 percent of the pay of the rank in which he was retired (Rev. Stat. §§ 1251, 1274 ; 10 U.S.C. §§ 933, 971 (1946)).

 Section 212 of the Public Health Service Act of July 1, 1944 was codified in the 1946 edition of the United States Code as 42 U.S.C. § 213.

 The Comptroller General’s apparent view, 27 Comp. Gen. 283 (1947), that the Army retirement legislation applied to such reserve officers Is not persuasive. That opinion rests on involved reasoning which seems to disregard the language of the 1944 Act and the main thrust of its legislative history, as well as Executive Order 9655, infra. In any event, the Comptroller General may have later withdrawn from that position, see 30 Comp. Gen. 378 (1951).

 The Issuance of supplementary regulations by the President was expressly authorized by Section 215(a) of the 1944 statute (58 Stat. at page 690).